# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: OCTOBER 29, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0002-MR

ARTHUR LONG                                          APPELLANT

ON APPEAL FROM LYON CIRCUIT COURT
V.               HONORABLE CLARENCE A. WOODALL, III, JUDGE
NO. 2017-CR-00001

COMMONWEALTH OF KENTUCKY                     APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Arthur Long was convicted by a Lyon Circuit Court jury of the murder of his sister and the theft by unlawful taking of her vehicle. Long received a life sentence for the murder charge and a five-year sentence for the theft charge, to run concurrently. He now appeals his convictions to this Court as a matter of right.[1] After review, we affirm.

## I. FACTUAL BACKGROUND

Long began living with his sister Nancy Minor sometime in 2015 after their mother died. Prior to that time Long was homeless in Chicago, Illinois, for many years, and Nancy would send him money and other means of support.

---

[1] Ky. Const. § 110(2)(b).

1

Both Long and Nancy were in their sixties during the events at issue in this case.[2]

On Tuesday, during the week of Thanksgiving 2016, Nancy had dinner with Janie Stovall who was a church friend of hers for many years. Janie testified that she spoke with Nancy on the phone on Friday of that week. Nancy asked Janie to bring her some of the cake that was served at Janie's dinner. Janie suggested that Nancy stop by her home that day to get some, but Nancy declined because she would be busy putting up Christmas decorations. Therefore, the two agreed that Janie would bring some cake to Nancy at church that Sunday. When Nancy did not show up to church, Janie began to worry as she knew Nancy to be very dependable. Janie testified that she believed she called Nancy that Sunday and got no answer. When Janie still could not contact Nancy by the following Tuesday, she called their pastor who also had not heard from Nancy. Ultimately their pastor contacted the police and requested a welfare check for Nancy.

Chief Shane Allison and Deputy Sam Adams (Dep. Adams) conducted the welfare check on Wednesday[3] of that week. All of the home's doors were locked, but Dep. Adams was able to enter the home through an unlocked window after moving several items from in front of the window inside the home.

_____

[2] No direct evidence of Nancy's age was presented at trial, but the defense's brief to this Court identifies her as being in her sixties and photographs of her seem to support that fact. An exhibit of a photograph depicting Long's identification card showed that he was born in 1950.

[3] Chief Allison testified that the police did not enter the home on Tuesday because, after consulting with the county attorney, he did not believe they had cause to enter the home at that time. By the next day law enforcement had pinged Nancy's phone and determined it had been shut off since Friday of the week prior, and they also determined that none of Nancy's friends or family had spoken to her that weekend. Chief Allison therefore believed there was cause to enter the home.

Dep. Adams discovered Nancy's body in the kitchen floor shortly after entering the home. The officers noted no signs of forced entry.

Nancy's body was found covered with a blanket as well as a significant amount of coffee grounds. Blood-soaked towels were also found around the body. Glass fragments from two different colored wine bottles were scattered about the kitchen floor and an intact wine bottle was found on the kitchen counter above Nancy's body. The intact bottle was covered in blood and hair. A kitchen mat, which was also covered in blood, was found in the kitchen sink. Officers also found a pair of men's pants, a short-sleeved white t-shirt, a long-sleeved black t-shirt, and a pair of socks in the washing machine. Subsequent lab tests determined that Nancy's blood was on the pair of pants, the white shirt, and the black shirt. After completing Nancy's autopsy, the Medical Examiner determined that her cause of death was multiple blunt force trauma to the head. Law enforcement therefore concluded that Nancy was beaten to death with the wine bottles found at the scene. The Medical Examiner also concluded that the state of Nancy's body was consistent with her dying sometime Sunday morning, though he could not pinpoint her exact time of death.

Detective Brian Hill (Det. Hill) with the Kentucky State Police (KSP) was dispatched to Nancy's home shortly after her body was discovered. During his investigation Det. Hill found that Long was captured on video surveillance cameras at an Eddyville gas station just before 2 p.m. on the previous Sunday; the day law enforcement suspected Nancy was murdered. Long put gas in Nancy's car, a grey 2007 Chevrolet Malibu, and then left the station. Nicole McVickers, Nancy's neighbor whose house faces Nancy's, testified that she saw

3

Long that evening between 5 and 6 p.m. Nicole noticed that Nancy's garage door was open, and that Long was in the garage around Nancy's car.

Based on this information, in conjunction with the fact that both Long and Nancy's car were missing from the home, Det. Hill entered Nancy's car into a national database and flagged it as stolen. Less than a week later, on December 5, Trooper William Looper (Trp. Looper) with the Tennessee Highway Patrol was working the midnight shift. Tpr. Looper was checking a rest area and noticed a car that was parked backwards in a parking spot. This piqued his interest because in his experience people do that in order to hide their license plate and/or tags. When he approached the car, he noticed that it was parked over the line, which was indicative of someone driving while impaired. He therefore decided to make contact with the driver.

Tpr. Looper observed a single occupant sleeping in the driver's seat, who was later identified as Long, and knocked on the driver's side window. Long woke up and looked at Tpr. Looper but proceeded to ignore him and did not follow any of his commands. Long started the car and fled from the rest area onto the interstate. Tpr. Looper chased Long for approximately fourteen miles, and eventually other officers were able to use a spike strip to stop Long's vehicle. Long initially ignored commands to exit the vehicle, and only complied when the officers threatened to deploy the K-9 officer at the scene. After Tpr. Looper read Long his Miranda[4] rights Long said he wanted an attorney and stopped talking. Long also refused to identify himself or cooperate with the booking process.

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

During the officers' subsequent search of Nancy's vehicle, they found several receipts that enabled them to track Long's movements from the Sunday that Nancy presumably was killed to the day before he was arrested. The first receipt was from the aforementioned purchase of gas from an Eddyville gas station. After that the receipts show that Long went to Paducah, Kentucky, followed by three different cities in southern Illinois. He then went back to Paducah, then to southern Illinois, then to Paducah, and then to Tennessee where he was ultimately apprehended.

Long now appeals his convictions for Nancy's murder and the subsequent theft of her car to this Court.

Additional facts are discussed below as necessary.

## II. ANALYSIS

Long asserts a myriad of alleged errors on appeal. Namely: (1) that his Sixth Amendment right to choose his own defense was violated; (2) that the trial court erred by finding him competent to stand trial; (3) that the trial court erred by denying his motion for a second competency hearing; (4) that the trial court erred by denying his initial motion for mental health expert funds and subsequently allowing a mental health expert from KCPC[5] to testify during the Commonwealth's rebuttal evidence; (5) that the trial court erred by denying his second and third motions for a continuance of trial; (6) that the trial court erred by failing to instruct the jury on first-degree manslaughter, second-degree manslaughter, and reckless homicide; and (7) that the trial court erred

---

[5] Kentucky Correctional Psychiatric Center.

by failing to grant his motion for directed verdict on the charge of theft by unlawful taking. For the reasons that follow, we affirm.

In order to provide context, we note preliminarily that Long's behavior from his arraignment until the end of trial was atypical. At nearly all of his pretrial hearings he frequently interrupted, argued with, and was outright rude to the trial court. And, while the trial court was exceedingly patient with Long, Long's outbursts forced the trial court to have him removed from the court room on two separate occasions: during the Commonwealth's opening statement and during the testimony of his own expert witness. He was also hostile towards his appointed counsel, and for the most part did not cooperate with her or the defense's expert witness.

However, though his behavior was bizarre in the sense that it does not typically occur, his outbursts and insults were always directly oriented towards his case. In addition, Long demonstrated that he is an intelligent person and also had some knowledge of the criminal justice system that lay persons do not usually have. For example, he demonstrated that he knew, generally, what an *ex parte* hearing is, what an interlocutory appeal is, and that a trial judge may sometimes be required to recuse himself or herself from a case. With that noted, we now address Long's arguments.

## A. Long was not deprived of his Sixth Amendment right to choose his own defense.

Long first contends that his Sixth Amendment[6] right to choose his own defense was violated because his defense counsel presented an insanity

---

[6] U.S. Const. Amend. VI.

defense against his wishes.  He asserts that the United States Supreme Court's recent holding in *McCoy v. Louisiana*,[7] as well as this Court's own holding *Jacobs v. Commonwealth*,[8] mandate that his convictions be reversed.

Long properly preserved this issue for appeal by several *pro se* statements he made to the trial court.  At a pretrial conference in July 2017, during which defense counsel requested that Long be evaluated for his competency to stand trial, the following exchange occurred:

> **Court:** You've been in court twice, and you've argued with me twice[9]…I'm going to have you examined from a mental competency standpoint.
>
> **Long:** Objection your honor, there's no evidence—
>
> **Court:** Objection noted.  The evidence is—
> **Long:** You're railroading me, and you know it.  There's no evidence, I saw the alleged discovery she gave, that was hearsay evidence.
>
> **Court:** You be quiet.  Thank you.  We'll look at this case again on October 2nd at 1 o'clock.
>
> **Long:** Where is the evidence that I'm mentally ill?  You know judge—
>
> **Court:** Sheriff, you may take Mr. Long from the court room.
>
> **Long:** You're railroading me.  You're in contempt of your own court.

---

[7] 138 S.Ct. 1500 (2018).

[8] 870 S.W.2d 412 (Ky. 1994), *overruled on other grounds by St. Clair v. Commonwealth*, 451 S.W.3d 597 (Ky. 2014).

[9] Prior to this exchange Long argued for several minutes with the court.  Long argued, essentially, that the trial court did not have jurisdiction over him because he was a resident of Illinois.

Then, at a later pre-trial conference in February 2018, after Long's KCPC report was completed, but prior to his competency hearing, the following exchange occurred between defense counsel, Long, and the trial court:

> **Counsel:** I would suggest since we do already have a trial date to go ahead and schedule this matter for a competency hearing.
>
> **Long:** I disagree your honor because [counsel is] still misrepresenting my defense, destroying my defense, the jurisdictional issues are preeminent issues. You hauled me off to that other place (KCPC) and they came back and said "fine." Okay, so now you're trying to discredit me again.
>
> **Court:** No one is trying to discredit you.
>
> **Long:** Yes you are because you're discrediting my ability to testify against issues that happened in this courtroom and in other issues.

Finally, during defense counsel's voir dire of the jury pool, defense counsel told the potential jurors that "there is going to be an insanity element to this case," and asked if any of the jurors know anyone with mental illness. Long objected to this question and said he had not discussed that defense with counsel. The court told Long he cannot make an objection while his own counsel is questioning the jury. Long replied that his counsel was tainting the jury. The court told him to be quiet and asked counsel to continue her questioning. Defense counsel then asked the jurors if they believed people with a mental illness are always treated fairly by society. Here, Long objected again and asked for a mistrial. He said:

> [counsel] is claiming that I'm guilty and mentally ill. I've said I'm innocent of the charges. If she's claiming that I'm guilty, if my lawyer believes I'm guilty then what are we doing here? This is ridiculous. I tried to

> fire her and you wouldn't let me fire her,[10] and you
> think I'm going to be quiet and be railroaded into
> something that I didn't do when I—

Here, the court again told Long to be quiet.  Long replied, "this lawyer needs to be quiet because she's destroying my case."  When counsel resumed her questioning, she told the jurors, "we believe Arthur isn't guilty."  To this, Long interrupted and said sarcastically "but he's crazy, oh that's wonderful.  There's no evidence that I'm mentally ill."

With preservation of the issue established, we note that such a violation, if found, is considered a structural error and is therefore subject to automatic reversal.[11]

In *McCoy*, the first case Long presents in support of his argument for reversal, McCoy was charged with three counts of capital murder for the shooting deaths of his estranged wife's mother, step-father, and son.[12]  The state of Louisiana's evidence against McCoy was described by the U.S. Supreme Court as "overwhelming."[13]  Notwithstanding the evidence against him, McCoy maintained his innocence; he claimed he "was out of State (sic) at the time of the killings and that corrupt police killed the victims when a drug

---

[10] Long is an indigent defendant and was therefore given appointed counsel from the Department of Public Advocacy.  On several occasions Long told the court he wanted to "fire" his attorney.  The court explained to Long several times that he did not have the right to choose his appointed counsel, and that the court would not remove appointed counsel from his case unless he was able to show cause.  The trial court went so far as to enter an order directed at Long to that effect.  Long never demonstrated cause to have appointed counsel removed.  The trial court's denial of Long's numerous motions to remove counsel are not at issue in this appeal.

[11] *See McCoy*, 138 S.Ct. at 1511.  *See also Jacobs*, 870 S.W.2d at 418.

[12] *McCoy*, 138 S.Ct. at 1505-06.

[13] *Id*. at 1506.

deal went wrong."[14] At trial McCoy wanted to assert a defense of innocence and seek a full acquittal.[15] But McCoy's defense attorney concluded that, based on the state's evidence of McCoy's guilt, McCoy's best chance to avoid the death penalty was to assert an insanity defense.[16] McCoy was adamantly against this trial strategy, and made his protestations known to the trial court.[17] The trial court denied McCoy's request to terminate his attorney's representation, and ruled that the defense they would proceed with was defense counsel's decision to make, not McCoy's.[18]

Ultimately, McCoy's attorney presented an insanity defense: he conceded that McCoy committed the murders but argued McCoy was legally insane when he committed them.[19] The jury found McCoy guilty of three counts of capital murder and sentenced him to death.[20] The Louisiana Supreme Court denied McCoy's request for a new trial, but the U.S. Supreme Court granted certiorari "in view of a division of opinion among state courts of last resort on the question whether it is unconstitutional to allow defense counsel **to concede guilt** over the defendant's intransigent and unambiguous objection."[21]

The opinion, penned by the late Justice Ginsburg, began by discussing that, with regard to legal representation in criminal cases, some decisions are

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 1506-07.

[20] *Id.* at 1507.

[21] *Id.* (emphasis added).

10

within the purview of the defense attorney.  For example, "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence."[22]  However, some decisions are entirely the defendant's to make, such as "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal."[23]  The Court held that the "[a]utonomy to decide that the objective of the defense is to assert innocence belongs in this latter category."[24]  More specifically, that

> [w]hen a client expressly asserts that the objective of '*his* defence' (sic) is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it **by conceding guilt**....  Once [McCoy] communicated that to court and counsel, strenuously objecting to [defense counsel's] proposed strategy, **a concession of guilt** should have been off the table.  The trial court's allowance of [counsel's] **admission of McCoy's guilt** despite McCoy's insistent objections was incompatible with the Sixth Amendment.[25]

The Court therefore reversed McCoy's conviction and remanded the case for a new trial.[26]

Twenty-four years before *McCoy*, this Court reached the same holding in *Jacobs*.  Jacobs was convicted of the capital murder, kidnapping, and attempted first-degree rape of a young college student.[27]  Similar to *McCoy*, the evidence against Jacobs was overwhelming and his story in support of his

---

[22] *Id.* at 1508.

[23] *Id.*

[24] *Id.*

[25] *Id.* at 1509-12 (emphasis added).

[26] *Id.* at 1512.

[27] *Jacobs*, 870 S.W.2d at 414.

innocence was fantastical.[28]  And, as in *McCoy*, Jacobs wanted to assert his innocence while counsel wanted to present an insanity defense, and the disagreement between them was brought to the attention of the trial court.[29] But the trial court ruled that the decision was within the discretion of defense counsel, and counsel presented an insanity defense over Jacobs' objections.[30]

On appeal to this Court Jacobs argued that his Sixth Amendment right to present a defense was violated by his counsel's presentation of an insanity defense over his protestations, thereby undermining his defense of innocence.[31] This Court noted that "**[n]o effort was made by trial counsel to present [Jacobs' innocence] defense on the merits**[.]"[32]  It therefore held that "Jacobs' Sixth Amendment right to present his defense of innocence was undermined by counsel's presentation of an insanity defense.  Neither counsel nor the court has the power to contravene a defendant's voluntary and intelligent decision to forego an insanity defense."[33]  The Court reversed Jacob's conviction on other grounds but noted that, had it not, it would have reversed on the insanity defense issue.[34]

Thus, it is clear from *McCoy* and *Jacobs* that a defense attorney cannot present a "complete" insanity defense against a defendant's wishes.  In other words, defense counsel cannot concede the defendant's guilt and assert that

---

[28] *Id.*

[29] *Id.* at 417.

[30] *Id.*

[31] *Id.*

[32] *Id.* (emphasis added).

[33] *Id.* at 418.

[34] *Id.*

the defendant is not culpable due to legal insanity if the defendant does not agree to concede his guilt. However, our jurisprudence is equally clear that this rule does not apply when defense counsel presents what we will call a "hybrid" insanity defense, i.e. when defense counsel argues that the defendant is insane, but never concedes his guilt, and also presents an innocence defense.

For example, in *Dean v. Commonwealth*,[35] Dean was convicted of capital murder, first degree burglary, and first degree rape.[36] On appeal to this Court Dean argued that his Sixth Amendment right to control what defense he asserted was violated when defense counsel presented an insanity defense over his objection, which Dean alleged undermined his defense of innocence.[37] He further maintained that "he was prejudiced by the incompatibility of these two defenses, which formed a suspect appeal to the jury."[38]

This Court declined to reverse Dean's conviction "because the conflict asserted [was] more apparent than real."[39] Specifically, that

> defense counsel's examination of defense witnesses contained elements designed to support both the reasonable doubt and insanity defenses. **[But], counsel never expressly conceded [Dean's] guilt**...Moreover, counsel did comply in part with [Dean's] wishes, as shown by his questioning of both prosecution and defense witnesses by which he attempted to refute the Commonwealth's proof.[40]

---

[35] 777 S.W.2d 900 (Ky. 1989), *overruled on other grounds by Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003).

[36] *Id.* at 901.

[37] *Id.* at 907.

[38] *Id.*

[39] *Id.*

[40] *Id.* at 907-08 (emphasis added).

The Court also highlighted that "defense counsel devoted the majority of his closing argument to casting doubt on the prosecution's proof."[41]

Consequently, the determinative question for this Court is what was the nature of the insanity defense presented by Long's attorney. Review of the record reveals that Long's attorney presented both an insanity and an innocence defense and never conceded Long's guilt. Long is therefore not entitled to a reversal of his conviction under *McCoy* and *Jacobs*.

In defense counsel's opening statement, she discussed both Long's insanity and his innocence. She began by stating that the evidence would show that Long was insane and walked through the evidence she anticipated in support of that conclusion. She then said,

> Now, just because Arthur is in fact insane does not mean he's responsible for his sister's death. There is also reasonable doubt on top of insanity. The doubt might not align with what Arthur thinks happened,[42] but Arthur's DNA is not on the murder weapon. The wine bottle has his sister's DNA on it, and has someone else's DNA on it, but not Arthur's DNA. Arthur had no blood on his shoes when he was picked up. And then Arthur's fingerprints were not on the wine bottle. Reasonable doubt exists regardless of the fact that Arthur is insane.

Defense counsel then used her cross-examination of the Commonwealth's witnesses to support both defenses. As it is undisputed that counsel focused on an insanity defense, there is no need to detail her cross-

---

[41] *Id.* at 908.

[42] Counsel mentioned earlier in her opening statement that Long believed government agents have been watching him and his family because, thirty-eight years ago, he uncovered a vast government conspiracy. She said Long therefore believed that government agents killed Nancy.

14

examination on that front. But, regarding the defense of innocence, counsel extracted testimony from Det. Hill that no identifiable prints were found on either the intact wine bottle or the shards of broken bottles, that Long's DNA was not found on any of the bottles, and Long did not have blood on his shoes when he was arrested.

Then, when cross-examining the Medical Examiner, counsel had him clarify that his finding of blunt force trauma as Nancy's cause of death did not mean that he knew definitively what weapon was used. But, rather, that a wine bottle would not be inconsistent with the injuries he found. Counsel also had him clarify that he could not say with certainty when Nancy died, but witness statements and the decomposition of her body led him to conclude that she could have died on Sunday.

Counsel later had Dr. Ladonna Jones, a forensic serologist with KSP, confirm again that the shoes Long was wearing when he was arrested did not have blood on them. Thereafter, when cross-examining Stephen Barrett (Barrett), a forensic DNA specialist with KSP, counsel elicited that Barrett could not say that Long's DNA was on the bottle neck of the intact wine bottle, nor did he find Long's DNA under Nancy's fingernails. Counsel also spent some time exploring whether it was possible that the reason Nancy's DNA was found on the clothing found in the washing machine was due solely to the fact that she lived in the house; that a simple "secondary transfer" of the DNA caused it to be there. Barrett said this was possible, but there were too many variables at play to say with certainty that it occurred. Counsel also confirmed through Barrett that it is impossible to say how long ago a person's DNA was transferred to a particular object.

15

The defense's sole witness in its case-in-chief was the defense's mental health expert Dr. Michael Nicholas, a neuropsychologist. While it is true Dr. Nicholas' testimony focused on proving an insanity defense, it should be noted that defense counsel never conceded Long's guilt in furtherance of that goal. In fact, Dr. Nicholas' testimony on direct and re-direct never broached the topic of what occurred at the time of Nancy's death. Dr. Nicholas instead discussed his numerous attempts to meet with Long, and Long's consistent refusal to fully cooperate with him. And the fact that he, consequently, had to base his conclusions about Long's mental state on his observations of Long. Similarly, defense counsel never conceded Long's guilt during her cross-examination of the Commonwealth's sole rebuttal witness, Dr. Amy Trivette, who is the medical director at KCPC.

Finally, in defense counsel's closing, she argued:

> I want to point out that Arthur Long is insane. He is insane. But I also want to point out that the Commonwealth, regardless of the fact that Arthur is insane, has not met their burden. You heard testimony that Arthur's DNA was not on the murder weapon, but Nancy Minor's DNA was. You heard testimony that Arthur Long's fingerprints were not on the murder weapon. You heard testimony that underneath Nancy Minor's nails, his DNA was not found. And you also heard testimony that his shoes when he was picked up had no blood on them. Those are all holes in the Commonwealth's case. And all those holes create reasonable doubt. So regardless of the fact that Arthur is insane, they have not met their burden to show that Arthur killed his sister.

Therefore, because defense counsel never conceded Long's guilt, and because she attempted to present an actual innocence defense, *McCoy* and *Jacobs* are not on point with the case at bar. Rather, this case in pertinent part is nearly identical to *Dean*, in which this Court approved of defense

16

counsel presenting a both a defense of innocence and an insanity defense due to the fact that counsel never conceded Dean's guilt. Long's Sixth Amendment right to choose his own defense was not violated.

## B. Competency Issues

### 1) The trial court did not err by finding Long competent to stand trial.

Long next asserts that the trial court erred by finding him competent to stand trial.[43] We disagree.

The state may presume that a defendant is competent to stand trial.[44] Therefore, the onus is on the defendant to prove, by a preponderance of the evidence,[45] that "as a result of mental condition, [he lacks the] capacity to appreciate the nature and consequences of the proceedings against [him] or to participate rationally in [his] own defense[.]"[46] This Court reviews a trial court's finding of competency for clear error and will therefore only reverse if that finding is not supported by substantial evidence.[47]

Long was initially sent to KCPC for a competency and criminal responsibility evaluation. After his KCPC evaluation was complete, defense counsel made a successful *ex parte* motion for expert funds under KRS Chapter 31[48] and retained Dr. Nicholas, a neuropsychologist. Prior to Long's competency hearing Dr. Nicholas attempted to meet with Long, but Long

---

[43] This issue was preserved for our review by defense counsel's first motion for a competency hearing. Kentucky Rule of Criminal Procedure (RCr) 9.22.

[44] *Jackson v. Commonwealth*, 319 S.W.3d 347, 349 (Ky. 2010).

[45] *Id.*

[46] Kentucky Revised Statute (KRS) 404.060(4).

[47] *Jackson*, 319 S.W.3d at 349.

[48] *See* KRS 31.110(1)(b) and KRS 31.185(1).

17

refused. Therefore, before the competency hearing, defense counsel moved for a continuance of the hearing so that Dr. Nicholas could again try to evaluate Long. The Commonwealth responded, and the trial court agreed, that Long's refusal to meet with his expert was not adequate grounds to continue the hearing.[49]

Dr. Amy Trivette was the sole witness at the competency hearing. Dr. Trivette is a board certified general and forensic psychiatrist and is also the Medical Director at KCPC. She discussed how evaluations at KCPC are interdisciplinary; patients are evaluated and/or observed by other psychiatrists, social workers, nursing staff, and recreation staff whose job is to report any notable behaviors. KCPC Staff members who are not mental health professionals are trained by KCPC to identify behaviors that should be reported.

Dr. Trivette testified that Long stayed at KCPC for about a month. During that time, Long cooperated somewhat with his social worker by providing his education and employment history. But he refused to participate in any formal psychiatric assessments and made it clear that he would not discuss Nancy's murder. Dr. Trivette therefore had to base her conclusions about Long's competency on both her own and her staff's observations of him.

Dr. Trivette concluded that Long was competent to stand trial and could be found criminally responsible for his actions. She based this conclusion on a number of factors. First, at no time during Long's stay did he show any signs

_____

[49] The trial court's denial of Long's motion to continue the competency hearing is not raised as an issue in this appeal.

18

of psychosis.  He never reported hallucinations, staff members never saw him responding to internal stimuli, and, on the rare occasions when he spoke with staff members, his thought processes were logical and goal oriented.  There was no evidence that he was suffering from mania; he had no racing thoughts or lack of sleep.  Dr. Trivette had no concerns about his intellectual functioning based on his reported educational history in addition to his vocabulary, abstracting ability, and functioning.  Further, he never displayed any bizarre behavior.  He participated in activities and interacted with other patients without incident.  He took care of both his personal hygiene and the cleanliness of his room without assistance from staff members.

Dr. Trivette also expounded that, while family members reported that Long had a history of schizophrenia, Long himself adamantly denied any history of schizophrenia or any other mental illness.  He said he was never diagnosed with a mental disorder and had never taken any psychiatric medication.  In that vein, Dr. Trivette also reported that Long was not on any psychiatric medication when he came to KCPC, and she never felt it necessary to prescribe him any.  This was another factor that made Dr. Trivette believe Long was not suffering from a major mental illness.  She explained that patients with schizophrenia in particular will rarely go unnoticed; they are frequently hospitalized involuntarily and, if necessary, forcibly medicated.

Instead, Dr. Trivette believed Long had an unspecified personality disorder with narcissistic traits.  She discussed how narcissists tend to view themselves as better than others with a need to associate with other "high status" individuals.  She supported her conclusion by noting that Long would act as though he was above the other patients and KCPC's staff, that he would

19

talk down about others and to others and was particularly critical of staff members.[50] In her opinion, Long refused to cooperate with psychological testing, not because he suffered from paranoia, but because he believed himself to be better than the process and that the process would not be helpful to him. She conclusively ruled out any sort of major mental illness that would render him unable to understand the proceedings against him or participate rationally in his own defense.

Following the competency hearing, the trial court made an oral finding on the record that Long was competent to stand trial. The court noted that any deficiency in KCPC's examinations of Long was the result of his own conscious decision not to participate in formal psychological testing. In the trial court's subsequent "findings of fact, conclusions of law, and order on defendant's competency," the court found that:

> [Long] did not appear "overtly psychotic" during his admission nor did his lack of participation lead Dr. Trivette to believe that Mr. Long was paranoid.
>
> Mr. Long denied that he was on any medication for any mental condition which is another indicator that he is not schizophrenic or psychotic.
>
> Dr. Trivette believed that Mr. Long is intelligent. He does not suffer from any intellectual disability and does not appear to be mentally ill.

We also feel it should be noted that by the date of his competency hearing Long had been before the trial court at least five times for his arraignment and several pre-trial conferences. In three of those appearances Long created

---

[50] Indeed, prior to Dr. Trivette's testimony, Long told the court that the staff at KCPC was "unprofessional."

outbursts and argued with the trial court, but all of his outbursts and arguments were directly related to his case. And, in the other two appearances, Long demonstrated that he could control his outbursts by remaining silent during them.

Based on the foregoing we hold that the trial court's finding of competency was based on substantial evidence. We therefore affirm.

### 2) The trial court did not err by denying Long's motion for a second competency hearing.[51]

Long also argues that the trial court erred by denying his motion to hold a second competency hearing. We disagree.

Whether to hold a competency hearing is within the discretion of the trial court.[52] However, a defendant's right to a competency hearing is protected by both KRS 504.100(1) and the Fourteenth Amendment of the United States Constitution, and if either of those provisions is triggered a trial court must hold a competency hearing.[53]

> [D]ifferent standards govern those interests. Due process under the Fourteenth Amendment requires that where substantial evidence that a defendant is not competent exists, the trial court is required to conduct an evidentiary hearing on the defendant's competence to stand trial. In contrast, under KRS 504.100, "reasonable grounds to believe the defendant is incompetent to stand trial" mandates a competency examination, followed by a competency hearing. Thus, while the failure to conduct a competency hearing implicates constitutional protections only when substantial evidence of incompetence exists, mere "reasonable grounds" to believe the defendant is

---

[51] This issue was preserved for our review by defense counsel's motion for a second competency hearing. RCr 9.22.

[52] *See, Henderson v. Commonwealth*, 563 S.W.3d 651, 663-64 (Ky. 2018).

[53] *Commonwealth v. B.H.*, 548 S.W.3d 238, 247-48 (Ky. 2018).

21

incompetent implicates the statutory right to an examination and hearing.[54]

Thus, a trial court errs by failing to hold a competency hearing when either: (1) substantial evidence that a defendant is not competent exists;[55] or (2) when reasonable grounds to believe the defendant is incompetent to stand trial[56] exist.

Four months after Long's competency hearing, defense counsel moved for a second competency hearing. Her basis for the motion was that Dr. Nicholas had completed his evaluation and had concerns about Long's competency. For whatever reason, counsel failed to include Dr. Nicholas' report in the record for our review. However, Dr. Nicholas later testified at length about his observations of and conclusions about Long as part of the defense's case-in-chief. We can therefore discern the content of Dr. Nicholas' report from his testimony at trial.

Preliminarily, we note that Dr. Nicholas attempted to evaluate Long on three separate occasions, but Long never cooperated. The first time Dr. Nicholas tried to meet with Long, Long refused to come out of his jail cell even after the deputy jailer explained to Long that his attorney wanted him to meet with Dr. Nicholas. On the second occasion Long actually met with Dr. Nicholas but would not discuss anything of substance. The third time was not a meeting with Long at all, but rather Dr. Nicholas' observations of Long during Long's meeting with the defense's mitigation specialist. Dr. Nicholas observed

---

[54] *Id.*

[55] U.S. Const. Amend. XIV.

[56] KRS 504.100.

Long without Long's knowledge. Therefore, like Dr. Trivette, Dr. Nicholas was never able to perform any formal psychological testing on Long.

Dr. Nicholas said he observed Long for approximately an hour to an hour and a half during Long's meeting with the mitigation specialist. Long talked about being prosecuted by the "government." He seemed to be "only oriented to his person," and believed he was being singled out by the government for reasons he could not or would not specify. Dr. Nicholas saw similarities between Long and delusional patients he saw in his private practice. Dr. Nicholas reviewed Dr. Trivette's report, but he did not look at the case file from the police's investigation. He therefore had no knowledge of Long's actions immediately following Nancy's murder, though he was aware that Long stole a car. Dr. Nicholas gave a "provisional diagnosis" that Long suffered from a delusional disorder. He explained that the term provisional diagnosis means that he did not have enough information to come to a concrete diagnosis, as he was unable to fully evaluate Long.

Dr. Nicholas' report and provisional diagnosis did not constitute substantial evidence that Long was not competent. They likewise did not present reasonable grounds to believe Long was not competent. This is particularly so when considering the facts discussed in section II(B)(1) of this opinion. We therefore hold that the trial court did not err by denying counsel's motion for a second competency hearing.

**C. The trial court did not err by denying Long's first motion for mental health expert funds, and the trial court's subsequent error of allowing Dr. Trivette to testify as the Commonwealth's rebuttal witness did not constitute palpable error.**

23

Long next alleges the trial court erred by denying his first motion for expert funds under KRS Chapter 31[57] (Chapter 31 funds). In addition, he asserts that the trial court violated this Court's recent holding in *Conley v. Commonwealth*,[58] when it allowed Dr. Trivette to testify for the Commonwealth during its rebuttal evidence.

The first issue—whether the trial court erred when it denied Long's first motion for expert funds—was properly preserved by counsel's motion for said funding.[59] A trial court's denial of a defendant's motion for expert witness funds is reviewed for abuse of discretion.[60] A trial court abuses its discretion when it rules in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[61]

However, the second issue—whether the trial court erred by allowing Dr. Trivette to testify as the Commonwealth's rebuttal witness—was not properly preserved for our review. Defense counsel did not object to Dr. Trivette testifying in rebuttal for the Commonwealth. Nonetheless, Long requested palpable error review of this issue.[62] To demonstrate palpable error "the required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law."[63]

**1) The trial court did not err by denying Long's first motion for Chapter 31 expert funds.**

---

[57] *See* KRS 31.110(1)(b) and KRS 31.185(1).

[58] 599 S.W.3d 756 (Ky. 2019).

[59] RCr 9.22.

[60] *McKinney v. Commonwealth*, 60 SW3d 499, 505 (Ky. 2001).

[61] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

[62] *See* RCr 10.26.

[63] *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006).

Under KRS 31.110(1)(b) and KRS 31.185(1), an indigent defendant may be granted state funds to hire an expert to aid in his defense if the defendant makes the requisite showing of entitlement to those funds. The test for whether a defendant showed entitlement to Chapter 31 funds before the trial court is: "1) whether the request [was pled] with requisite specificity; and 2) whether funding for the particularized assistance [was] 'reasonably necessary'; 3) while weighing relevant due process considerations."[64]

Here, defense counsel's first motion for expert funds was a non *ex parte* motion in which counsel requested a competency evaluation for Long. The defense requested that she receive Chapter 31 funds to hire a defense expert to have Long evaluated for competency, rather than following the normal course of having him sent to KCPC for a competency evaluation. This request was made during a side bench in the presence of the Commonwealth:

> **Def:** Judge, [co-counsel] and I went down to the Christian County Jail to speak with Mr. Long and he refused to come out. He said he wanted some real attorneys. So I don't know what his position is...But I do want to go forward with getting him evaluated. Judge I would prefer to file a motion requesting funds for my own expert on a case of this magnitude, rather than have him sent to KCPC. Which, you know, obviously I'm going to be asking for anyway. So I would ask for you to consider allowing me to do it that way rather than sending him to KCPC.
>
> **Court:** [Commonwealth?]
>
> **CW:** I would ask that he be sent to KCPC. Getting funds through the general fund I guess is what you're requesting?
>
> **Def:** Yeah.

---

[64] *Benjamin v. Commonwealth*, 266 S.W.3d 775, 789 (Ky. 2008).

25

> **Court:** On your motion… I'm not going to tell you not to file the motion. I will tell you that I'll have a difficult time finding necessity until after there's been an examination at KCPC. Because they may decide your (defense's) way. And then once we have their report, then I generally would authorize the necessity of a separate one.
>
> **Def:** Judge I will probably go ahead and file one, just for the record. And we'll go from there.
>
> **Court:** Alright. Do you want to say that when you're back standing next to him or do you want me to just say I'm going to go ahead and authorize a competency evaluation?
>
> **Def:** If you could go ahead and state that, that would be great.

We hold that the trial court did not abuse its discretion by denying this motion. While defense counsel's motion was specific about the type of expert she wanted and why she wanted the expert, she did not demonstrate reasonable necessity. When a defendant's mental health is in question, trial courts routinely have the defendant sent to KCPC first for competency and criminal responsibility evaluations. The defense did not present any facts that would warrant deviation from that standard procedure.

## 2) The trial court erred under *Conley* by allowing Dr. Trivette to testify as the Commonwealth's rebuttal witness, but that error was not palpable.

Long also asserts that the trial court violated this Court's recent holding in *Conley* by allowing Dr. Trivette to testify for the Commonwealth during its rebuttal evidence.

26

Conley brutally stabbed her mother to death during an argument which she claimed to have no memory of.[65]  Conley had a long and, presumably, well-documented history of mental illness.[66]  Conley filed a pre-trial motion seeking Chapter 31 funds to hire a mental health expert, one Dr. Ed Conner, "to assist in preparing her for trial."[67]  Conley's motion argued that it would be inappropriate to send her to KCPC because "by their own admission and policy they cannot act as a defense expert witness."[68]  The trial court found her motion failed to demonstrate reasonable necessity for the funds.  The court then sent Conley to KCPC for evaluation.[69]  Dr. Trivette happened to be the expert that evaluated Conley at KCPC.[70]

Conley thereafter renewed her request for expert witness funds to hire Dr. Conner.[71]  Conley's motion contended that

> Dr. Trivette's examination was insufficient because all KCPC did was examine her for criminal responsibility, but that she needed an independent expert such as Dr. Conner who would investigate and evaluate all her psychological issues, including other possible relevant mental health issues, possible EED issues, and potential mitigation factors at sentencing.[72]

Based on this motion, the court reversed its initial ruling and found Conley was entitled to expert funds to hire Dr. Conner.[73]

---

[65] *Conley*, 599 S.W.3d at 762.

[66] *Id.*

[67] *Id.*

[68] *Id.* at 763.

[69] *Id.* at 762.

[70] *Id.*

[71] *Id.* at 763.

[72] *Id.*

[73] *Id.*

Later, Conley filed a motion under RCr 8.07(2)(A)(iii) to give notice of her intent to present mental health evidence through an expert.[74]  In response, the Commonwealth filed a motion under RCr 8.07(2)(B) for a rebuttal mental health examination.[75]  The Commonwealth said it would accept the KCPC report prepared by Dr. Trivette in lieu of an independent mental health expert examination.[76]  Conley agreed the Commonwealth was entitled to its own expert under RCr 8.07.[77]  But she argued against giving the Commonwealth Dr. Trivette's report because

> she had not wanted to go to KCPC in the first place, but the court would not give other funding.  Therefore, she maintained she was, in effect, forced into that situation because, as the trial court's order in sending her to KCPC was part of the defense investigation, the report was protected attorney-client work product, and the Commonwealth was therefore not entitled to it.[78]

Initially the trial court agreed with Conley, but it later reversed its own ruling and allowed the Commonwealth access to Dr. Trivette's report.[79]  The trial court also designated Dr. Trivette as the Commonwealth's expert witness and allowed the Commonwealth to impeach Conley through Dr. Trivette based on the information in her report.[80]

On appeal, this Court held that the trial court committed reversible error for two interwoven reasons.  First, unlike in Long's case, defense counsel's first

---

[74] *Id.* 763-64.

[75] *Id.* at 764.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.* at 764-65.

motion for Chapter 31 funds demonstrated reasonable necessity for those

funds:

> Based upon the extraordinary circumstances of [the] case, it was evident from the outset that Conley's sanity at the time of the offense had the potential to be a significant factor at trial, and thus it was the trial court's duty to assure Conley had access to "a competent mental health expert who [would] conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense." And, KCPC would not provide that assistance.[81]

Second, the trial court's subsequent grant of Chapter 31 funds to hire Dr.

Conner did not cure the error of failing to grant defense counsel's initial motion

for funds.[82] This was because the Court held that Dr. Trivette essentially

"switched sides."[83] In other words, when the trial court denied Conley's initial

motion for Chapter 31 funds and sent her to KCPC, it made Dr. Trivette the

defense's expert witness.[84] And, "[e]ven though the trial court eventually

permitted funds to Conley to retain Dr. Conner…the trial court at the same

time permitted the Commonwealth to commandeer Dr. Trivette to testify

against Conley[.]"[85] We believe it is important to also note that Dr. Trivette

gained confidential information from Conley,[86] and that Dr. Trivette's testimony

was used to impeach Conley.[87]

---

[81] *Id.* at 765 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)).

[82] *Id.* at 766.

[83] *Id.* at 766-67.

[84] *Id.*

[85] *Id.* at 767.

[86] *Id.*

[87] *Id.* at 770.

To begin, it should be noted that Long's case is clearly distinguishable from Conley's in several ways. First, Conley's first request for Chapter 31 funds was for an expert "to assist in preparing her for trial."[88] In contrast, Long requested an expert solely to evaluate him for competency, which the *Conley* Court itself noted is a common and accepted function of KCPC:

> We begin by noting the difference between a defendant being sent to KCPC for a competency to stand trial examination pursuant to KRS 504.100 and a defendant in need of an expert witness to assist him or her in pursuing a defense based on insanity or other mental illness or condition. KRS 504.100 requires the trial court, if it has reasonable grounds to believe the defendant is incompetent to stand trial, to appoint a psychiatrist or psychologist to report on the defendant's competency to stand trial for the crime charged. Generally, the function of a competency to stand trial proceeding conducted through KCPC is for the benefit of the trial court to assess whether a defendant has the present mental capabilities to communicate with trial counsel and assist in his or her own defense. The expert witness appointed under KRS 504.100 for a competency to stand trial evaluation at KCPC does not "belong" to the defendant, but rather the expert acts as an agent of the trial court.
>
> In contrast, a mental health expert to which an indigent defendant may be entitled under *Ake*[89] serves the purpose of assuring that a defendant is placed upon the same footing as a person of means in assessing possible defenses and trial strategies relating to his mental state at the time the crime was committed. An expert appointed under *Ake* may accurately be described as "belonging" to the defendant, unlike the evaluator acting as an agent of the trial court in a competency to stand trial proceeding.[90]

---

[88] *Id.* at 762.

[89] *Ake v. Oklahoma*, 470 U.S. 68 (1985).

[90] *Id.* at 768-69 (internal citations omitted).

And, as discussed *supra,* Long was not clearly entitled to an independent mental health expert from the outset like Conley. In fact, it may be that the only reason the trial court granted Long's subsequent *ex parte* motion for expert funds was because it found KCPC to be "impractical"[91] due solely to Long's refusal to cooperate with formal testing while there.

In addition, in *Conley* the Commonwealth filed an RCr 8.07 motion for an independent expert, and the trial court ultimately designated Dr. Trivette as its expert, hence the Court's discussion of "side-switching" by Dr. Trivette. In Long's case, although the Commonwealth called Dr. Trivette as a rebuttal witness, it never had Dr. Trivette designated as its expert witness under RCr 8.07.[92] Conley also asserted the defense of EED rather than Long's defense of insanity. Further, unlike in *Conley*, neither Dr. Trivette nor anyone else that worked for KCPC received any confidential information relevant to an insanity defense from Long because he refused to discuss anything of substance with them. Finally, and perhaps most importantly, Dr. Nicholas did not testify that it was his opinion that Long was legally insane. Therefore, on the key issue of

---

[91] *See* KRS 31.185(1).

[92] The Commonwealth filed an RCr 8.07 motion solely to preserve the filing deadline. It stated:

> They have filed a notice to rely on mental disease or defect. We have not received a report yet. I assume that's due to the uncooperativeness of the defendant. I filed the motion simply because if we receive the report and I feel like he needs to be evaluated further I want to be able to request that's done at that time. For today's purposes I don't feel like there's anything that needs to be done, I just wanted to reserve my right to do that. [...] After we review the report, we may not need the re-evaluation. That's just something I'll determine when I review it.

But the Commonwealth never filed a subsequent motion for its own expert to re-evaluate Long.

31

legal insanity, both Dr. Nicholas and Dr. Trivette attested to the same thing: they could not say definitively that Long was legally insane.

Those key differences would be enough for this Court to say that the trial court committed no error under *Conley*. However, after the *Conley* Court's analysis specific to Conley's case, the Court sought to provide additional guidance to trial courts in more typical cases such as Long's. On that front, it stated:

> Finally, we note that perhaps the more common situation is where, unlike here, the facts are ambiguous and inconclusive as to whether the defendant is entitled to a mental health expert from the outset. In such situations, the trial court may properly send the defendant to KCPC for an evaluation to assist the trial court (often perhaps in conjunction with a competency evaluation), for its own benefit, not the defendant's, to determine in the first instance if the defendant qualifies for an outside independent mental health expert under *Ake*.
>
> Following the KCPC evaluation on behalf of the trial court in these ambiguous situations, if the trial court thereafter concludes the defendant is entitled to an expert under *Ake*, and the Commonwealth then seeks to retain KCPC to provide the prosecution with a rebuttal mental health expert, we believe *Ake* would compel that a second KCPC evaluator be assigned to act as the Commonwealth's expert witness and, to the extent practicable, the initial KCPC evaluator and evaluation should be "walled off" from the second evaluator who may then serve as the Commonwealth's expert at trial.[93]

Thus, although the Commonwealth never actually sought to have Dr. Trivette designated as its expert witness through an RCr 8.07 motion, the trial court should have declined to allow Dr. Trivette to testify in rebuttal for the

---

[93] *Id*. at 769-70.

Commonwealth. Instead, *Conley* would require that the court choose another "walled off" expert from KCPC to testify for the Commonwealth or choose an expert that was not associated with KCPC to testify for the Commonwealth.

But that error does not rise to the level of palpable error. Again, Dr. Nicholas did not testify that it was his expert opinion that Long was legally insane. On direct examination, Dr. Nicholas said it was his provisional diagnosis that Long suffered from a delusional disorder and that he did not believe Long was able to "control himself." But, when pressed on cross-examination, Dr. Nicholas acknowledged both that not everyone with a delusional disorder is legally insane, and that he was not telling the jury that Long was insane at the time of Nancy's murder. Therefore, when Dr. Trivette also testified that Long was not legally insane in rebuttal, it did not create a "probability of a different result or [constitute an] error so fundamental as to threaten a defendant's entitlement to due process of law,"[94] as is required to demonstrate palpable error. We consequently affirm.

**D. Motions for Continuance[95]**

Long's next assertion of error is that trial court abused its discretion by denying his second and third motions for a continuance of trial. Long's first motion for a continuance of trial was successful. The basis for that motion was that counsel had not been able to review all of the discovery with Long yet and

---

[94] *Martin*, 207 S.W.3d at 3.

[95] Long's arguments regarding his second and third motions for continuance were preserved for our review via counsel's motions for continuance of trial. *See* RCr 9.22.

needed more time to do that. The Commonwealth had no objection, and the trial court granted the motion.

Whether a trial court grants a motion for continuance of trial is within its discretion depending upon the unique facts and circumstances of the case before it.[96]

> Factors that should be considered by the trial court include:
> (1) The length of delay;
> (2) Whether there have been any previous continuances;
> (3) The inconvenience to the litigants, witnesses, counsel, and the court;
> (4) Whether the delay is purposeful or caused by the accused;
> (5) The availability of competent counsel, if at issue;
> (6) The complexity of the case; and
> (7) Whether denying the continuance would lead to any identifiable prejudice.[97]

Appellate courts review a trial court's denial of a motion for a continuance of trial for abuse of discretion.[98] A trial court abuses its discretion when it rules in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[99] With that said, we will address Long's second and third motions for continuance in turn.

### 1) Trial court did not abuse its discretion by denying defense counsel's second motion for a continuance of trial.

Defense counsel made her second motion for a continuance of trial on September 14, 2018. This motion was made ten months after counsel's first

---

[96] *Eldred v. Commonwealth*, 906 S.W.2d 694, 699 (Ky. 1994), *abrogated on other grounds by Commonwealth v. Barroso*, 122 S.W.3d 554 (Ky. 2003).

[97] *Id.*

[98] *Smith v. Commonwealth*, 481 S.W.3d 510, 514 (Ky. App. 2016).

[99] *English*, at 945.

motion for a continuance and slightly more than six weeks before trial was set to start on October 29th. Counsel's basis for this motion was that the defense's investigation was ongoing, and she needed more time to gather records. Counsel asked that the court take into consideration that this was not a typical case; that Long's reluctance to cooperate had caused delays in every step of her preparation for trial. She suggested moving the trial date to sometime in January.

The Commonwealth objected to the motion. She argued that the crime occurred in November of 2016, and that Long was arraigned in June of 2017.[100] And, that the trial was originally set for June of 2018, but defense counsel was granted its first motion for continuance to give it more time to prepare for trial. The Commonwealth argued the defense already had sufficient time to prepare its case.

The trial court agreed with the Commonwealth. The court believed that the only reason the defense was not on schedule in its preparation for trial was Long's refusal to be totally cooperative. The court acknowledged the predicament that defense counsel was in but denied the motion in light of the previous continuance and the timeline of the case as noted by the Commonwealth. The court also noted that it considered the competency of defense counsel, who he knew to be a very competent attorney.

Regarding the factors to be considered when ruling on a motion for continuance of trial, it could be argued that the three-month length of delay

---

[100] Because Long was apprehended in Tennessee, the Commonwealth had to obtain a governor's warrant to have him extradited back to Kentucky. This caused the delay between his arrest in December of 2016 and his arraignment in June of 2017.

requested was relatively short. However, there had already been a previous continuance and the trial court believed that the defendant was the sole reason that defense counsel was behind schedule. That belief, we should note, is strongly supported by the record. Finally, the court found that defense counsel was highly competent based on the many trials she tried before it in the past. We therefore hold that the trial court did not abuse its discretion by denying Long's second motion for a continuance of trial.

2) **Trial court did not abuse its discretion by denying defense counsel's third motion for a continuance of trial.**

On September 28th, exactly two weeks after her second motion for a continuance, defense counsel filed a third motion for a continuance of trial. In counsel's written motion she argued that she received "an additional fifty pages of discovery containing important DNA results etc." as well as "new phone calls and audio interviews of potential witnesses." Counsel asserted that she could not adequately investigate all of the new material before trial began on October 29th.

At the subsequent hearing on the matter, held on October 1st, the Commonwealth explained that she had just received the discovery evidence herself and was not happy about it either. But after she reviewed the material, she realized there was very little new evidence in it. Instead, there were several duplicate documents and information that had been provided in discovery previously. There was no new DNA evidence, only updated chain-of custody documents regarding the DNA evidence. There were two new audio recordings; one was about 8 minutes long and the other was about 13 minutes long. However, the content of those recordings was provided previously. There was

36

also evidence release forms and the governor's warrant for Long's extradition, but those were not relevant for trial purposes.

Defense counsel acknowledged that there was no new DNA evidence, and she did not dispute the fact that the majority of the items were previously provided. But she requested a continuance of a month to review the chain of custody evidence, the audio of the witnesses, and any follow up investigation she had not had time to do.

The trial court denied the motion. It explained that there was no allegation of "discovery dumping," and while the discovery was late the Commonwealth forwarded it to the defense as quickly as possible. Based on what was included in the discovery, the court did not think there was enough new information to be prejudicial to the defense. The court noted that if the defense found something that was in fact prejudicial, it would review the matter again. The defense never renewed the motion.

We hold that the trial court did not abuse its discretion by denying counsel's motion. Defense counsel simply did not demonstrate any identifiable prejudice. The Commonwealth did not intentionally withhold the evidence, as she had just received it herself and forwarded it to defense counsel immediately. In addition, the Commonwealth's written response to counsel's motion contained an itemized list of every item included in the discovery, the majority of which the Commonwealth noted had been previously provided. Defense counsel never argued that any of the evidence had not been provided previously. And, as for any genuinely new evidence, defense counsel never alleged that those items would have any relevance at trial. We accordingly affirm.

## E. Jury Instruction Issues

Long's next assertion is that the trial court erred by denying his motion to submit instructions to the jury on first-degree manslaughter, second-degree manslaughter, and reckless homicide. This issue was preserved by defense counsel's tender of jury instructions on those offenses.[101] A physical copy of the defense's tendered instructions was not included in the record to this Court. However, the defense's oral motion in support of its tendered instructions was on the video record.

Trial courts have a statutory duty to instruct the jury on the whole law of the case.[102] This duty extends to instructing on lesser-included offenses, if warranted.[103] However,

> [a] lesser-included offense instruction… is not proper simply because a defendant requests it. An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that the defendant is guilty of the lesser offense.[104]

Stated differently, a trial court is not obligated to give an instruction that is not reasonably supported by the evidence.[105]

We review trial court rulings on jury instructions for abuse of discretion.[106] A trial court abuses its discretion when it rules in a way that is

---

[101] *See* RCr 9.54(2).

[102] *See* RCr 9.54(1).

[103] *Thomas v. Commonwealth*, 170 S.W.3d 343, 349 (Ky. 2005).

[104] *Swan v. Commonwealth*, 384 S.W.3d 77, 99 (Ky. 2012) (internal quotation marks omitted).

[105] *See Jackson v. Commonwealth*, 481 S.W.3d 794, 797 (Ky. 2016).

[106] *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006).

arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[107] With these principles in mind, we will discuss each of Long's arguments in turn.

### 1) The trial court did not err by failing to instruct jury on first-degree manslaughter.

Long first asserts that the jury should have been instructed on first-degree manslaughter.

For our purposes, a defendant can be convicted of first-degree manslaughter when either: (1) intending to cause serious physical injury, he causes the death of another person; or (2) he causes the death of another person while acting under the influence of extreme emotional disturbance (EED).[108]

The Commonwealth's theory of the case was that Long attacked Nancy with three different wine bottles with the intent to cause her death. This would preclude an instruction under either theory of first-degree manslaughter.

The defense offered two theories of the case. One, Long did not murder Nancy; or, two, if the jury believed Long murdered Nancy, it must find that he was legally insane when he did. Therefore, the defense presented no evidence that Long attacked Nancy only intending to cause serious physical injury. We also note that Long's use of three different wine bottles to beat Nancy greatly contradicts any notion that he only meant to cause serious physical injury to her.

---

[107] *English*, 993 S.W.2d at 945.

[108] *See* KRS 507.030.

Long was likewise not entitled to a first-degree manslaughter instruction under an EED theory. A jury instruction on EED "must be supported by some definite, non-speculative evidence."[109] The evidence must show that there was an identifiable triggering event[110] which caused the defendant to "suffer a temporary state of mind so enraged, inflamed, or disturbed as to overcome [the defendant's] judgment, and to cause [the defendant] to act uncontrollably from an impelling force of the extreme emotional disturbance rather than from evil or malicious purposes."[111] Here, the defense never introduced evidence of an identifiable triggering event, nor did it offer evidence that Long acted under EED.

Accordingly, because neither the Commonwealth's nor the defense's evidence supported an instruction under either theory of first-degree manslaughter, the trial court did not abuse its discretion by failing to instruct the jury on it.

### 2) The trial court erred by failing to instruct jury on second-degree manslaughter.

Long's next contention is that the jury should have been instructed on second-degree manslaughter.

---

[109] *Padgett v. Commonwealth*, 312 S.W.3d 336, 341 (Ky. 2010) (internal quotation marks omitted).

[110] *Driver v. Commonwealth*, 361 S.W.3d 877, 888 (Ky. 2012).

[111] *Padgett*, 312 S.W.3d at 341.

A defendant can be convicted of second-degree manslaughter when he "wantonly[112] causes the death of another person."[113] This Court has previously expounded that this encompasses two different theories of guilt:

> (1) the defendant acted without an intent to kill but with an awareness and conscious disregard of a substantial and unjustifiable risk that his action would result in the victim's death; [or] (2) the defendant acted either with or without an intent to kill but under an actual but mistaken belief that the circumstances then existing required the use of physical force (or deadly physical force) in self-protection, and with an awareness and conscious disregard of a substantial and unjustifiable risk that such belief was mistakenly held.[114]

We reiterate that the Commonwealth's evidence was that Long acted with intent to kill and that the defense argued that if Long killed Nancy, he did so while legally insane. Therefore, the Commonwealth's evidence certainly did not support a finding under a theory of wanton murder. The defense's evidence likewise did not support such a finding because its evidence focused on proving that Long was legally insane, not that he acted wantonly. As for the second theory of guilt, there was never any suggestion from the defense that Long acted against Nancy in self-defense.

Accordingly, the trial court did not abuse its discretion by declining to instruct the jury on second-degree manslaughter.

### 3) The trial court did not err by failing to instruct jury on reckless homicide.

---

[112] *See* KRS 501.020(3) (defining "wanton" mental state).

[113] KRS 507.040.

[114] *Saylor v. Commonwealth*, 144 S.W.3d 812, 818 (Ky. 2004) (internal citations omitted).

41

Lastly, Long argues that the trial court should have instructed the jury on reckless homicide.

A defendant is guilty of reckless homicide when "with recklessness[115] he causes the death of another person."[116]  This means either

> (1) the defendant acted without an intent to kill but failed to perceive a substantial and unjustifiable risk that his actions would result in the victim's death; [or] (2) the defendant acted either with or without an intent to kill but under an actual but mistaken belief that the circumstances then existing required the use of physical force (or deadly physical force) in self-protection, and failed to perceive a substantial and unjustifiable risk that such belief was mistakenly held.[117]

Again, the Commonwealth's evidence did not support of finding that Long acted with recklessness when he killed Nancy, as it contended he acted intentionally.  The defense's evidence also did not support a finding of recklessness because it focused on proving that Long was legally insane, not that he acted recklessly.  There was also no evidence that Long acted in self-defense.

The trial court accordingly did not abuse its discretion by failing to instruct the jury on reckless homicide.

**F. The trial court's alleged error of denying Long's motion for a directed verdict on the count of theft by unlawful taking was not properly preserved for our review.**

Long's final argument is that the trial court erred by denying his motion for directed verdict on the count of theft by unlawful taking of Nancy's car.  He

---

[115] *See* KRS 501.020(4) (defining "reckless" mental state).

[116] KRS 507.050.

[117] *Saylor*, 144 S.W.3d at 819 (internal citations omitted).

asserts that, because the Commonwealth's theory was that he took Nancy's car after he killed her, he could not have intended to permanently deprive her of the car[118] because a deceased person cannot be deprived of property. Or, in the alternative, that the Commonwealth could not prove that Long did not have Nancy's permission to use the car. However, this issue was not properly preserved for our review.

In order to preserve an alleged directed verdict error for appellate review, a defendant must move for directed verdict at the close of the Commonwealth's case in chief and must thereafter renew the motion for directed verdict at the end of all the evidence;[119] here, the Commonwealth's rebuttal. The motions for directed verdict must state the specific element of a particular charge the Commonwealth allegedly failed to prove.[120]

Defense counsel moved for directed verdict on the count of theft by unlawful taking at the close of the Commonwealth's evidence. Counsel said she believed Long had Nancy's permission to use the vehicle, although it should be noted there was no evidence presented to that effect. However, when counsel renewed the motion for directed verdict at the close of the Commonwealth's rebuttal, she made no mention of the theft charge. Therefore, the issue was not properly preserved.

---

[118] "(1) [A] person is guilty of theft by unlawful taking or disposition when he unlawfully: (a) Takes or exercises control over movable property of another with intent to deprive him thereof[.]" KRS 514.030. *See also Hall v. Commonwealth*, 551 S.W.3d 7 (Ky. 2018).

[119] *See Baker v. Commonwealth*, 973 S.W.2d 54, 55 (Ky. 1998).

[120] Kentucky Rule of Civil Procedure (CR) 50.01.

Long failed to request palpable error review for this issue under RCr 10.26.[121] "Absent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review pursuant to RCr 10.26 unless such a request is made and briefed by the appellant."[122] Under the facts presented by this case a failure to review Long's theft conviction for palpable error would not result in a substantial miscarriage of justice. We consequently decline to address this issue.

### III.   CONCLUSION

Based on the foregoing, we affirm.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Brandon Neil Jewell
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Leilani K.M. Martin
Assistant Attorney General

---

[121] "A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." RCr 10.26.

[122] *Murphy v. Commonwealth*, 509 S.W.3d 34, 42 (Ky. 2017) (quoting *Shepherd v. Commonwealth*, 251 S.W.3d 309 (Ky. 2008)).